**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**WARREN CLYDE BURGESS,**

                 **Plaintiff,**

   **-against-**

**CAROLYN W. COLVIN,**
**Commissioner of Social Security,**

                **Defendant.**

**OPINION AND ORDER**

**15-CV-9585 (RLE)**

**HONORABLE RONALD L. ELLIS, U.S.M.J.:**

## I.    INTRODUCTION

Plaintiff Warren Clyde Burgess ("Burgess") commenced this action under the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner

of Social Security ("Commissioner") denying his claim for Social Security benefits. On January

19, 2016, and pursuant to 28 U.S.C. § 636(c), both Parties consented to the jurisdiction of the

undersigned. (Doc. No. 9.)

On May 27, 2016, Burgess moved for judgment on the pleadings, asking the Court to

reverse the decision of the Commissioner and remand the case for a calculation and award of

benefits or, alternatively, to remand the case for further proceedings. (Doc. No. 14.) Burgess

argues that (1) the Administrative Law Judge ("ALJ") failed to weigh the medical evidence in

accordance with the treating physician rule; and (2) the ALJ failed to properly evaluate Burgess's

credibility. (Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") at 7-15.)

On June 27, 2016, the Commissioner filed a cross-motion for judgment on the pleadings, asking

the Court to affirm her final decision. (Doc. No. 16.) The Commissioner argues that (1) the ALJ

properly weighed the opinion evidence; (2) the ALJ's credibility finding was supported by

substantial evidence; and (3) the ALJ's residual functional capacity finding was supported by

substantial evidence. (Mem. of Law. in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem.") at 15-25.) For the reasons that follow, Burgess's motion is **GRANTED**, the Commissioner's cross-motion is **DENIED**, and the case is **REMANDED** for further administrative proceedings.

## II.    BACKGROUND

### A.    Procedural History

Burgess applied for Supplemental Security Income Benefits ("SSI") on June 23, 2011, alleging disability beginning July 26, 2010. (Transcript of Administrative Hearing ("Tr.") at 10, 238.) The application was initially denied on September 21, 2011. (*Id.* at 105-10.) On October 6, 2011, Burgess submitted a request for a hearing. (*Id.* at 111-12.) A hearing was held before ALJ Selwyn S. C. Walters on May 8, 2012. (*Id.* at 56-79.) Burgess appeared *pro se*. (*Id.* at 58.) On August 17, 2012, ALJ Walters issued a decision denying Burgess'ss SSI claim on the grounds that Burgess was not disabled within the meaning of the Act. (*Id.* at 82-98.)

On October 12, 2012, Burgess submitted a request for review of the ALJ's decision to the Appeals Council. (*Id.* at 145.) The Appeals Council granted the appeal on November 8, 2013, under the substantial evidence and new and material evidence provisions of the Act. (*Id.* at 101.) The Appeals Council found that there was no vocational evidence in the record regarding the extent to which the assessed non-exertional limitations erode the occupational base for light exertion work, and new and material evidence was submitted that indicates Burgess's impairments may be more limiting than found in the decision. (*Id.*) The Appeals Council vacated the decision and remanded the case to an ALJ. (*Id.* at 102.) On April 2, 2014, a video hearing was held before ALJ Sheena Barr. (*Id.* at 10.) Burgess was represented by Ryan Peterson, an attorney. (*Id.*) Victor G. Alberigi, an impartial vocational expert, also appeared at

the hearing. (*Id.*) On June 27, 2014, ALJ Barr issued a decision denying Burgess's SSI claim on the grounds that Burgess has not been disabled within the meaning of the Act since June 23, 2011, the date the application was filed. (*Id.* at 10-20.) Burgess appealed the decision on July 25, 2014. (*Id.* at 34.) On October 21, 2015, the Appeals Council denied Burgess's request for review and the ALJ's decision became the Commissioner's final decision. (*Id.* at 1-3.) Burgess filed this Complaint on December 8, 2015. (Doc. No. 1.)

**B.    The ALJ Hearing**

**1.    Administrative Hearing Testimony and Other Sworn Statements**

Burgess testified at hearings before ALJ Walters and ALJ Barr. He was born on March 3, 1982, in Harlem, New York. (Tr. at 62, 75.) He testified that he is five feet and ten inches in height and weighs two hundred and fifty pounds. (*Id.*) When ALJ Walters asked about any recent changes to his body, he testified that in the two years before the hearing, he had gained approximately twenty-five to thirty pounds because his medication makes him hungry. (*Id.*) He is single and has four children who do not live with him. (*Id.*) He has an eleventh grade education. (*Id.* at 75.)

Burgess testified that he stays with different family members. At the time of his hearing with ALJ Walters, he was staying at the home of his children's mother. (*Id.* at 63-64.) At the time of his hearing with ALJ Barr, he had been staying at his cousin's house for approximately a year. (*Id.* at 42.) At his cousin's house, he helps take out the garbage and babysit his cousin's daughter. (*Id.* at 43.) He spends most of his time watching television. (*Id.* at 44.) Although he has a driver's license, he testified that he does not drive "at all." (*Id.* at 65.) When asked if he attended social functions, he testified that he tries but suffers from migraines. (*Id.* at 65.) He visits family "sometimes," because his family lives elsewhere and it is "hard to travel." (*Id.* at

66.)  He testified that he does not go out with his friends because "when [he is] around… they can't do nothing [sic]."  (*Id.* at 65.)  He testified that he does not have any hobbies and does not smoke, drink, or do drugs.  (*Id.* at 67.)  He was previously incarcerated for four years for selling drugs and gun possession.  (*Id.* at 67.)

Burgess calls his four children every day.  (*Id.* at 43.)  He testified that it was "hard to see them" because "it makes [his] anxiety and depression come on."  (*Id.*)  He feels like he "can't do anything for them" and it "hurts [his] feelings."  (*Id.*)  He is "scared of being… somewhere with just [them]" because he is afraid of experiencing an anxiety attack alone.  (*Id.*)

Burgess testified that he last worked in 2008.  (*Id.* at 38.)  From 2006, he was a driller's helper in construction work and did heavy labor work, including lifting pipes and carrying boxes.  (*Id.* at 38-39.)  He performed soil sampling and rock testing, and typically had to lift sixty pounds.  (*Id.* at 46-47.)  He worked for a catering service for a few months in 2007.  (*Id.* at 49.)  He supplied food to schools for about 2,000 people, and had to lift more than twenty pounds.  (*Id.* at 49-50.)  He also worked as a messenger for a delivery service between 2005 and 2006, where he drove the company van.  (*Id.* at 48, 51.)  He also had a job repairing fire extinguishers from 2005 to 2006.  (*Id.* at 76.)

Burgess testified that his illness started after he attended a party where someone slipped him drugs.  (*Id.* at 39.)  He suffered a stroke in his face and was diagnosed with Bell's Palsy.  (*Id.* at 40.)  Since then, he has been having panic attacks, chest pains, migraines, anxiety and depression.  (*Id.* at 39.)  The incident occurred in 2006 but the symptoms "just started coming back […] harder and harder" and he has "been fighting it most of the time."  (*Id.* at 69-70.)  He has panic attacks "everyday" where he "feel[s] like [he's] going to die," which cause headaches and sometimes cause him to blackout.  (*Id.* at 40.)  There are no identifiable triggers.  (*Id.*)  He

4

suffers from migraine headaches "all the time" because his nerves have not fully recovered from Bell's Palsy. (*Id.* 40-41, 68, 74.) The headaches can get so intense that he has "blurry vision." (*Id.* at 41.) When he walks outside, he feels like he is "dreaming" and everyone is "lighting up," which "hurts [his] eyes" and makes him feel "scared." (*Id.* at 44.) He also "get[s] dizzy fast." (*Id.*) He testified that he tries to leave the house "at nighttime where there [are] no lights," and has to "stay focused." (*Id.*) Although he "can pay attention... for a little while," "everything just gets boring" and "it makes [him] depressed." (*Id.*) He testified that he can travel alone "sometimes" but the last time was "a long time ago." (*Id.* at 64.) When he is on a train with many people, he gets "nervous" and his "heart starts racing." (*Id.*)

Burgess testified that when he "started trying to work" in 2011, he would experience "panic attacks." (*Id.* at 70.) He did not specify what work he was doing, but he lost that job because when he lifts heavy things, he "start[s] feeling like [he is] blacking out." (*Id.*) During the hearing before ALJ Walter, he testified that his hands were "sweaty" and his heart was "racing" because he was "nervous." (*Id.* at 70.) He felt like he was "high" because "all of this feels fake." (*Id.* at 70-71.) He testified that he could not return to work because of his "stamina." (*Id.* at 76.) He could not walk for more than two or three blocks without getting dizzy or drowsy. (*Id.*)

Burgess sees a psychiatrist, Dr. Sharma. (*Id.* at 41-42.) At the time of his hearing before ALJ Barr, he had been seeing Dr. Sharma once a month for a year. (*Id.*) At his hearing before ALJ Walters, Burgess testified that he was seeing Dr. Fink, a psychiatrist, and Carol Newmark, whom he identified as a physical therapist at Montefiore Medical Center. (*Id.* at 60.) He has also made several visits to the emergency room at Montefiore. (*Id.* at 61.)

Burgess takes Lexapro and Alprazolam for his migraines. (*Id.* at 41, 71-72.) He also takes Ibuprofen, which "[takes] the headache away a little bit," but not "fully." (*Id.* at 74.) The medication causes him to become drowsy. (*Id.* at 41.) He also takes medication for anxiety, depression, panic attacks, and insomnia. (*Id.*) When ALJ Walters asked about the effectiveness of the medication, Burgess testified that he has days when he is "doing good" and "doing bad again," and "there's really no medication" that works because it is "really mental." (*Id.*) Burgess testified that the medicine he took gave him side effects, including "a drip in the throat" and "nausea." (*Id.* at 45.) The medication takes "a whole half-an-hour to a[n] hour just to let it settle." (*Id.* at 44.) He has to "lay down with all the lights off" until it has "kicked in" because of the nausea. (*Id.* at 45.) The medicine makes him "high all day." (*Id.*) Burgess also works on "breathing exercises" and "relaxation exercises." (*Id.* at 72.)

### 2.        Medical Evidence and Opinions

#### a.        Mental Impairment Evidence

##### (1)        Parvesh Sharma, M.D., Treating Psychiatrist

Dr. Parvesh Sharma is a psychiatrist with University Behavioral Associates, under Montefiore Behavioral Care. (Tr. at 520.) He has been treating Burgess since December 4, 2012. (*Id.* at 455, 518.) The record contains copies of prescriptions from Dr. Sharma and notes from December 27, 2012, to February 20, 2014. (*Id.* at 449, 452, 464-66, 525-29.) In his intake assessment, Burgess complained that he "feel[s] very anxious all the time." (*Id.* at 520.) Dr. Sharma recorded symptoms of "anxiety," "panic attacks," and "paranoia." (*Id.*) The mental status evaluation recorded a "cooperative" attitude, "anxious" mood, "coherent" and "age-appropriate" speech and comprehension, and an "intact" thought process with no hallucinations or delusions. (*Id.* at 522-23.) Dr. Sharma's biopsychosocial formulation was that Burgess

suffered from panic disorder with symptoms of panic attacks. (*Id.* at 523.)  In his treatment plan,

Dr. Sharma identified problems of "panic disorder," "poor sleep," and "low self-esteem." (*Id.* at

524.) He estimated that it would take about nine to twelve months to achieve the treatment

goals.  (*Id.*)

In a psychiatric questionnaire completed on December 27, 2012, Dr. Sharma diagnosed

Burgess with panic disorder and a risk of psychiatric disorder.  (*Id.* at 455.)  Using the American

Psychiatric Association's multi-axial system, Dr. Sharma diagnosed Burgess with panic disorder

on Axis I, deferred diagnosis on Axis II, and assigned a GAF score of 56. [1]  (*Id.*)  The prognosis

given "depends" on whether he is "compliant" with treatment.  (*Id.*)  Dr. Sharma noted that

Burgess suffered from "sleep disturbance, mood disturbance, emotional liability, elusions,

recurrent panic attacks, difficulty thinking or concentrating, persistent irrational fears, and

generalized persistent anxiety." (*Id.* at 456.)  Dr. Sharma opined that Burgess faces mild

limitations in his ability to understand and remember one or two step instructions, to carry those

instructions out, to sustain ordinary routine without supervision, to interact appropriately with the

general public, and to maintain socially appropriate behavior.  (*Id.* at 458-460.)  He opined that

Burgess faces moderate limitations in his ability to remember locations and work-like

procedures, carry out detailed instructions, work in coordination with or proximity to others,

make simple work decisions, ask simple questions, accept instructions, and get along with co-

---

[1] The American Psychiatric Association's multi-axial system assesses an individual's mental and physical condition, with each of five axes describing a different class of information. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed. 2000) ("DSM–IV–TR"). Axis I refers to clinical disorders; Axis II refers to personality disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V refers to the individual's global assessment of functioning ("GAF"). DSM–IV–TR at 27–37.GAF is a numeric scale ranging from 0 through 100. A GAF score in the range of 41 to 50 signifies "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. at 34. A GAF score in the range of 51 to 60 signifies "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. The multi-axial system has since been replaced by a more simplified, nonaxial approach in the DSM-5. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013).

workers. (*Id.*) Finally, he opined that Burgess faces marked limitations in the ability to understand and remember detailed instructions, to maintain attention for extended periods, to perform activities within a schedule, to complete a normal workweek without interruptions, to respond appropriately to changes in the work setting, to travel to unfamiliar places, and to set realistic goals and make independent plans. (*Id.*) Dr. Sharma noted that Burgess experienced episodes of deterioration or decompensation. (*Id.* at 460.) Dr. Sharma opined that Burgess was incapable of even low stress work. (*Id.* at 461.) He also opined that Burgess is likely to be absent from work for more than three times a month as a result of his impairment. (*Id.* at 462.)

Between December 27, 2012, and February 20, 2014, Burgess appears to have missed two appointments in February 2013, three appointments in May 2013, and one appointment in June 2013. (*Id.* at 526, 528.) He did not attend any appointments from June 2013 to January 2014 because "he did not have any panic attacks." (*Id.* at 529.) The mental status examinations during appointments record "fair" attention and concentration, "logical" thought process, and "fair" memory. (*Id.* at 525-29.) They regularly record a "constricted" affect. (*Id.*)

### (2)      Rebecca Fink, M.D., Treating Psychiatrist

Dr. Rebecca Fink is a psychiatrist with Montefiore Medical Center. The record reflects visits from February 23, 2011, to February 22, 2012. (Tr. at 548.) In a treatment plan dated November 16, 2011, Burgess is diagnosed with a GAF score of 60. (*Id.* at 553.) In a report from December 29, 2011, his mental status examination is normal except for a "depressed" mood. (*Id.* at 549.) Dr. Fink notes that Burgess is "inconsistent" in adhering to medication. (*Id.*) She encouraged "daily compliance" in taking medication "for maximal therapeutic effect." (*Id.*) In another report dated February 17, 2012, Burgess's problems are listed as "panic attack" and being "unemployed," and he was given a GAF score of 62. (*Id.* at 551.)

(3)        **Carole Newmark, L.C.S.W.**

Carole Newmark is a social worker at Montefiore Medical Center. (Tr. at 377.) In a letter dated January 31, 2011, she wrote that she has been treating Burgess biweekly for "Panic Disorder without Agoraphobia" since August 16, 2010. (*Id.*) His panic attacks began approximately two years ago and have been "a deterrent to his working in construction." (*Id.*) The report notes that Burgess is taking Lexapro and Alprazolam for depression and anxiety, as diagnosed by the psychiatrist, Dr. Yel. (*Id.*) In a letter signed by Dr. Zinaida Yel dated January 19, 2011, it is noted that Burgess has been in treatment at Montefiore since August 16, 2010, for panic disorder. (*Id.* at 376.)

In a progress note from September 20, 2011, Newmark noted that Burgess complained that he had anxiety "all the time." (*Id.* at 476.) He complained of increased lethargy and feeling "tense, dizzy [and] headachy [sic]." (*Id.*) He also complained about his medication because he "feels they're not working." (*Id.*) The mental status examination recorded a mood that was "irritable" and "anxious, but noted that Burgess was adhering to his medication. (*Id.*) Newmark recommended that Burgess continue with medication and see his primary care physician. (*Id.*) She also wrote that he should "[continue] to seek employment." (*Id.*) In another progress note dated October 19, 2011, Newmark noted that Burgess complained that he is "not doing good." (*Id.* at 480.) The mental status examination reflects that his mood was "depressed" and "irritable." (*Id.*) It noted that Burgess was adhering to medication, and again recommended that he continue to take medication and to seek employment or go back to school. (*Id.*) In a progress note from November 4, 2011, Newmark noted that Burgess reported having anxiety attacks. (*Id.* at 491). Burgess also reported being "afraid to work" because he was afraid of "becoming dizzy and ill." (*Id.*) The mental status exam reflected a mood that was "irritable" and "anxious." The

9

plan was to continue to "seek school to learn electronics." (*Id.*) In a progress note from November 17, 2011, Newmark wrote that Burgess reports that he is "tired." (*Id.* at 492.) Burgess reported that he has been able to "ride out the anxiety attacks" and is "making good progress." (*Id.*) The plan recommended that he continues to go forward with electronics training. (*Id.*) In a progress note dated December 29, 2011, Burgess reported that he is "feeling a little better." (*Id.* at 493.) He reported that he had "a few anxiety attacks," but was "able to work through the anxiety." (*Id.*)

Newmark also wrote another letter dated November 17, 2011, confirming that Burgess is still a patient. (*Id.* at 432.) She wrote that "at this time, [Burgess] is unable to work due to his mental illness." (*Id.*) She noted that Burgess "is progressing in treatment" and projects that "he may be able to return to working anywhere from 6 to 12 months." (*Id.*)

### (4)      Jaime F. Franco, M.A., L.C.S.W.

Jaime Franco is a Master's Level Psychologist and Licensed Clinical Social Worker. (Tr. at 433.) In a letter dated July 20, 2012, and addressed to Bronx Family Court, Franco notes that Burgess has been a client since June 22, 2012. (*Id.*) He notes that Burgess was experiencing "multiple symptoms of acute anxiety" and "accompany depression," which "seriously affect his overall functioning and greatly compromise his ability to work at present. (*Id.*) Franco opined that "given the severity of his symptoms, Mr. Burgess's condition will probably last for at least a few months." (*Id.*)

### (5)      Montefiore Hospital

The record shows that Burgess made numerous visits to the emergency room in Montefiore from December 6, 2009, to June 19, 2012. Burgess was admitted to the Montefiore Emergency Department on December 6, 2009, and discharged on the same day. (Tr. at 336.) He

10

complained of ear pain and headache. (*Id.* at 336.) Dr. Gerald Brody noted "right ear pain, inability to move right side of face normally, right facial numbness and decreased taste right side of tongue with constant frontal headache," but the physical examination was otherwise normal. (*Id.* at 337-38.) A CT scan revealed "ventricles somewhat dilated for age." (*Id.* at 337.) He was diagnosed with Bell's Palsy and referred to a neurology specialist. (*Id.*)

Burgess was admitted again on July 24, 2010, and discharged on July 26, 2010. (*Id.* at 342.) He was admitted with "chest pain of [one] day duration, palpitations, tingling sensation in chest." (*Id.*) He was placed under security watch in the hospital. (*Id.* at 344.) He reported "feeling anxious for the last [three] days" and that he "feels high although he didn't do any drugs." (*Id.* at 345.) He also reported that "he feels dizzy at times, and he feels his heart beat fast." (*Id.*) He was diagnosed with panic disorder without agoraphobia. (*Id.* at 342.) Burgess was evaluated by a psychiatrist and prescribed psychiatric medication. (*Id.*) Burgess told the physician that "the attacks [have] been getting longer and more intense." The psychiatrist's assessment recorded anxiety, leukocytosis, and anemia. (*Id.* at 356-358.) Burgess also underwent an internal medicine check that recorded that the "physical exam is unremarkable." (*Id.* at 358.) A radiology exam showed "no evidence of acute cardiopulmonary disease" and was "unremarkable." (*Id.* at 369.)

Burgess was also admitted on August 18, 2010. (*Id.* at 439.) He was diagnosed with "headache," "panic attack," and "anxiety." (*Id.*) The doctors prescribed regular-strength Tylenol for his headaches. (*Id.*)

Burgess was admitted again on February 22, 2011. (*Id.* at 378.) He was diagnosed with "Headache, Type Unknown," and "Anxiety State (Unspecified)." (*Id.*) The records noted that "all of the tests performed today were normal." (*Id.* at 379.)

11

Burgess was also admitted on October 3, 2011, and discharged the same day. (*Id.* at 417.) He complained of chest pain, headache, and dizziness. (*Id.*) He was sent for a chest X-ray, an EKG, and blood work, which revealed no abnormalities. (*Id.* at 424.)

Burgess was admitted again on May 29, 2012, with complaints of dizziness and chest tightness. (*Id.* at 497.) He reported feeling like his abdomen and chest were "on fire." (*Id.* at 498.) His physical examinations were normal. (*Id.* at 499-500.) The attending doctors recorded a likely "panic attack" or "heat exhaustion." (*Id.*)

On June 19, 2012, Burgess visited Montefiore's Fordham Family Practice with complaints of acute headaches. (*Id.* at 538.) He complained of pain of ten on a scale of one to ten. (*Id.*) Dr. Uche Akwuba requested an MRI and on August 2, 2012, Burgess was sent for an MRI of his brain that showed no abnormalities. (*Id.* at 534-36.)

### (6)      Herb Meadow, M.D., Consultative Psychiatrist

Dr. Herb Meadow is a consultative psychiatrist with Industrial Medicine Associates. He examined Burgess on August 10, 2011. (Tr. at 385.) During the examination, Burgess told Dr. Meadow that he has difficulty falling asleep. (*Id.*) He testified that he has a poor appetite and had lost thirty pounds in the past year. (*Id.*) Dr. Meadow identified symptoms of depression, "dysphoric moods, irritability, low energy, diminished self-esteem, difficulty concentrating, [and] being socially withdrawn." (*Id.*) The mental status examination showed that Burgess had a "cooperative" demeanor and his manner of relating was "adequate." (*Id.* at 386.) His appearance, speech, thought process, and other indicators were normal. (*Id.*) Dr. Meadow noted that his mood was "depressed" and "anxious," and that his cognitive functioning was "average" with the "general fund of information somewhat limited." (*Id.*)

12

Dr. Meadow opined that Burgess "would have some difficulty dealing with stress" but

otherwise "would be able to handle […] other tasks necessary for vocational functioning." (*Id.*

at 387.)  The results of the examination "appear to be consistent with psychiatric problems," but

the problems do not "appear to be significant enough to interfere with [Burgess's] ability to

function on a daily basis." (*Id.*)  He diagnosed Burgess with "depressive disorder, NOS [not

otherwise specified]," "panic disorder without agoraphobia," and "generalized anxiety disorder,"

on Axis I; he deferred diagnosis on Axis II; and he identified "headaches," "dizziness," and

"hypertension" on Axis III. (*Id.*)  He recommended that Burgess continue with psychiatric

treatment. (*Id.*)

### (7)      David Mahony, Ph.D., Consultative Psychiatrist

Dr. David Mahony is a psychiatrist with Industrial Medicine Associates.  He saw Burgess

on January 14, 2014, for a consultative examination. (Tr. at 472.)  Dr. Mahony's notes show that

Burgess reported symptoms of depression. (*Id.* at 473-74.)  He noted that Burgess has "cognitive

deficits secondary to symptoms of anxiety, including concentration difficulties and difficulty

learning new material." (*Id.* at 473.)  The mental status examination was normal except that Dr.

Mahony noted that Burgess was "depressed." (*Id.*)

Dr. Mahony diagnosed Burgess with "generalized anxiety disorder" and "major

depressive disorder, mild." (*Id.* at 474.)  Dr. Mahony opined that "there is no evidence of

limitation" in Burgess's ability to follow and understand simple directions and perform simple

tasks. (*Id.*)  He opined that Burgess has "mild difficulties" maintaining attention and

concentration and maintaining a regular schedule, and "moderate limitation" in learning new

tasks, performing complex tasks, making appropriate decisions, relating to others, and dealing

with stress. (*Id.*)  He traced these to "psychiatric problems" and opined that "these will interfere

with the claimant's ability to function on a daily basis." (*Id.*) He recommended that Burgess continue to receive psychiatric treatment, but noted that Burgess "does not appear to be responding to psychiatric treatment." (*Id.* at 475.)

### (8)    V. Reddy, M.D., Medical Consultant

Dr. V. Reddy is a medical consultant and did not examine Burgess in person. Dr. Reddy opined that Burgess's allegations are "partially supported by medical evidence [o]n file." (Tr. at 411.) He concluded that Burgess "retains the ability to perform entry-level, unskilled work in a low contact setting on a sustained basis." (*Id.*)

### b.    Physical Impairment Evidence

### (1)    Barbara Akresh, M.D., Consultative Physician

Dr. Barbara Akresh is a physician with Industrial Medicine Associates. Burgess was referred to her by the Division of Disability Determination on August 10, 2011. (Tr. at 389.) Dr. Akresh recorded that Burgess's chief complaint was the incident when he was drugged at a party. (*Id.*) He also reported that "sometimes his vision becomes blurred, and he cannot walk very far." (*Id.*) He also complained about migraine headaches everyday "for the past [one and a half] years." (*Id.*) Dr. Akresh noted a history of Bell's palsy "which he states was attributed to stress," but further noted that "this has resolved." (*Id.*) Dr. Akresh's physical examination was normal. (*Id.* at 390.) Burgess's general appearance, gait, and station were normal and he had no difficulties walking or moving around. (*Id.* at 391.) His head and face were normal. (*Id.*) His neurologic examination was also normal with "no sensory deficit noted." (*Id.*)

Dr. Akresh's prognosis of Burgess was "good." (*Id.* at 392.) She opined that Burgess has "mild limitations in his ability to be exposed to bright lights, secondary to the history of chronic migraine headaches." (*Id.*)

(2)      **Benjamin Kropsky, M.D., Consultative Physician**

Dr. Benjamin Kropsky is a physician with Industrial Medicine Associates. Burgess was referred to him on December 5, 2013, by the Division of Disability Determination. (Tr. at 467.) Dr. Kropsky notes that Burgess "has occasional asthmatic bronchitis, but does not have chronic asthma." (*Id.*) He also notes that Burgess had Bell's Palsy in the past and has "right facial paresis secondary to the Bell's palsy." (*Id.* at 468.)

Dr. Kropsky diagnosed Burgess with "depression, anxiety, and panic attacks," "migraine headaches," "chest pains of uncertain etiology," "Bell's palsy with a right facial paresis," and "recurrent episodes of asthmatic bronchitis." (*Id.* at 470.) His prognosis for the above diagnoses is "fair," except for "depression, anxiety, and panic attacks," which is "fair to guarded." (*Id.*) He opined that Burgess "should avoid dust smoke and other known respiratory irritants because of the asthmatic bronchitis," and that Burgess is "limited in activities because of his psychological problems" but "has no definite physical limitation." (*Id.*)

3.      **Vocational Expert Testimony**

Vocational expert Victor Alberigi testified at the hearing before ALJ Barr. (Tr. at 50.) ALJ Barr suggested a hypothetical individual

> of the same age, education, and work experience as the claimant, who is able to perform work at the light exertional level, but would not be able to be exposed to bright lights, heights, dangerous machinery or operate a motor vehicle, the individual would also be limited to simple, routine, repetitive tasks, would be limited to a low stress environment, meaning only occasional decision making required, and occasional changes in the work setting, and a low contact environment, with only occasional interaction with the public, coworkers, and supervisors.

(*Id.* at 50-52.) The ALJ asked if that individual could do any of their past work, and Alberigi opined that they would not be able to. (*Id.*) Alberigi testified that other work was available, including that of a housekeeper, laundry sorter, and a clerical assistant. (*Id.* at 52-53.) The ALJ

then suggested an individual who, in addition to the above characteristics, would be off-task for five percent of the workday. (*Id.* at 53.) Alberigi opined that the individual could still do the jobs available, but not if he was off-task for ten percent of the workday. (*Id.*) The ALJ then suggested an individual with the above characteristics who would be off-task for five percent of the workday and would miss work at least one day a month due to symptoms. (*Id.*) Alberigi opined that someone with accrued time off would still be able to work, but a new hire would not be able to work. (*Id.* at 54.)

### 4.      The ALJ's Decision

On June 27, 2014, ALJ Barr issued a decision denying Burgess's application for SSI. (Tr. at 10.) The ALJ followed the required five-step sequential analysis to make her determination of disability. 20 C.F.R. § 416.920(a). First, she established that Burgess has not engaged in substantial gainful activity since June 23, 2011, the date of application. (*Id.* at 12.) Second, she found that Burgess had severe impairments of anxiety, panic attacks, mood disorder, and headaches. (*Id.*) She noted that Burgess has a history of Bell's Palsy but there is no indication that it has caused significant limitations in his ability to work, and therefore it is not severe. (*Id.*) Third, she found that Burgess does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, and is not presumptively disabled. (*Id.* at 12-14.)

At the fourth step of the analysis, ALJ Barr concluded that Burgess has the residual functional capacity

> to perform light work as defined in 20 C.F.R. § 416.967(b) except that he cannot
> be exposed to bright lights, heights, dangerous machinery, or operate a motor
> vehicle. He is also limited to simple, routine, repetitive tasks, in a low stress
> environment, meaning only occasional decision making required and occasional
> changes in the work setting, and a low contact setting, meaning occasional

16

interaction with the general public, coworkers, and supervisors; and he would be
off task five percent of the workday due to symptoms from impairments.

(*Id.* at 14.) ALJ Barr determined that Burgess's medically determinable impairments could

reasonably be expected to cause the alleged symptoms but that his "statements concerning the

intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.* at

15.) Specifically, ALJ Barr noted that Burgess reported that he has "debilitating anxiety and

panic attacks, but his mental status examinations were largely normal." (*Id.* at 18.) Burgess also

told Dr. Fink and Newmark that he was doing some work and school, and "although it provoked

some anxiety, he was still able to do it." (*Id.*) ALJ Barr also noted that Burgess was

"inconsistent with his medication use" and "cancelled or did not show up to many psychotherapy

or medication management treatment sessions." (*Id.*) ALJ Barr also focused on Burgess's

activities of daily living, noting that he testified that he babysits and takes out the garbage. (*Id.*)

She noted that he can "play games on his phone and focus on the television for a while" even

though "the light hurts his eyes." (*Id.*)

Under the fourth step, ALJ Barr also weighed the medical opinion evidence to inform her

determination of Burgess's residual functional capacity. (*Id.* at 17-18.) She assigned "little

weight" to the opinion of Carole Newmark because "it directly contradicts her treatment notes in

which she states that the claimant should seek employment," and "is also inconsistent with the

findings of the mental status examinations, which were largely normal." (*Id.* at 18.) She

assigned "little weight" to the opinion of Jaime Franco because "it is unsupported by any

treatment notes" and is "inconsistent with the medical evidence." (*Id.*) She assigned "little

weight" to Dr. Parvesh Sharma's medical source statement because it was written "after only one

appointment" and Burgess's mental status examination at the appointment showed that "he was

fully alert, had no delusions, and had intact memory and concentration." (*Id.*) In contrast, she

assigned "significant weight" to Dr. Barbara Akresh's opinion "because it is consistent with the medical evidence documenting the claimant's history of migraines." (*Id.*) She assigned "little weight" to Dr. Benjamin Kropsky's opinion that Burgess should avoid respiratory irritants as there is "no objective evidence in the record of any history of asthmatic bronchitis," but assigned "significant weight" to his opinion that Burgess has no other physical limitations "because it is consistent with the claimant's physical examinations. (*Id.*) She assigned "significant weight" to the opinions of Drs. Herb Meadow and David Mahony because they are "based on clinical findings" and "consistent with the medical evidence." (*Id.*) She assigned "great weight" to Dr. Reddy's opinion because "it is based on a review of the record and is consistent with the objective evidence." (*Id.*)

Finally, at the fifth step, ALJ Barr found that Burgess could not perform any past relevant work. (*Id.* at 18.) However, she found that Burgess retained the residual functional capacity to perform jobs that exist in significant numbers in the national economy, such as that of a "housekeeper/office cleaner," "laundry sorter," or "clerical assistant." (*Id.* at 19.) Therefore, ALJ Barr concluded that Burgess has not been under a disability as defined in the Act since June 23, 2011. (*Id.* at 20.)

## III.   DISCUSSION

### A.   Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g), 1383(c)(3). Therefore, a reviewing court does not determine de novo whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21

(1976) (citing 42 U.S.C. § 405(g)).  Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision.  42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447.  Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g).  If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand.  (*Id.*)

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR").  *See, e.g., Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (SSR).  In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning.  *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. § 423(d)(5)(B), 1382c(a)(3)(H)(i). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based." 42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand). Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

## B.      Determination of Disability

### 1.      Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is

entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." Id. at § 416(i)(1)(A),

423(d)(1)(A), 1382c(a)(3)(A); see also 20 C.F.R. § 404.1505, 416.905.  A claimant's

impairments must be "of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A),

1382c(a)(3)(B); see also 20 C.F.R. § 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the

Commissioner is required to conduct the following five-step inquiry:  (1) determine whether the

claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the

claimant has a "severe impairment" that significantly limits his or her ability to do basic work

activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the

regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not,

determine whether the claimant possesses the RFC to perform his past work despite the

disability; and (5) if not, determine whether the claimant is capable of performing other work.

20 C.F.R. § 404.1520; Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Gonzalez v. Apfel, 61 F.

Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at

the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant

is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation. 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. § 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. § 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5). A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. § 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. § 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. An ALJ should not consider whether the severity of an individual's alleged symptoms is supported by objective medical evidence. Social Security Ruling ("SSR") 16-3P, 2016 WL

1119029, at *3.  Second, the ALJ "evaluate[s] the intensity and persistence of [the claimant's]

symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity

for work." 20 C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49.

The ALJ must consider the entire case record, including objective medical evidence, a claimant's

statements about the intensity, persistence, and limiting effects of symptoms, statements and

information provided by medical sources, and any other relevant evidence in the claimant's

record.  SSR 16-3P, 2016 WL 1119029, at *4-6.  The evaluation of a claimant's subjective

symptoms is not an evaluation of that person's character.  Id., at *1.

  In making the determination of whether there is any other work the claimant can perform,

the Commissioner has the burden of showing that "there is other gainful work in the national

economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)

(citation omitted).

### 2.   Treating Physician Rule

  The SSA regulations require the Commissioner to evaluate every medical opinion

received.  *See* 20 C.F.R. § 404.1527(c); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.

1993).  The opinion of a claimant's treating physician is generally given more weight than the

opinion of a consultative or non-examining physician because the treating physician is likely

"most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)."

20 C.F.R. § 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d

Cir. 2008) (discussing the "treating physician rule of deference").  A treating physician's opinion

is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the]

case record." 20 C.F.R. § 404.1527(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir.

2015) ("SSA regulations provide a very specific process for evaluating a treating physician's opinion and instruct ALJs to give such opinions 'controlling weight' in all but a limited range of circumstances.").

If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); *Schisler*, 3 F.3d at 567-69. The Commissioner may rely on the opinions of other physicians, even non-examining ones, but the same factors must be weighed. 20 C.F.R. § 416.927(e).

The ALJ is required to explain the weight ultimately given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 129); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199-200 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not

permitted to arbitrarily substitute his own judgment of the medical proof for the treating

physician's opinion. *Balsamo*, 142 F.3d at 81.

Furthermore, an ALJ "cannot reject a treating physician's diagnosis without first

attempting to fill any clear gaps in the administrative record," especially where the claimant's

hearing testimony suggests that the ALJ is missing records from a treating physician. *Burgess*,

537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79); *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 438

(S.D.N.Y. 2003) ("[A] proper application of the treating physician rule mandates that the ALJ

assure that the claimant's medical record is comprehensive and complete."). Similarly, "if an

ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty

to seek out more information from the treating physician and to develop the administrative

record accordingly." *Hartnet v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998), *accord Rosa*,

168 F.3d at 79.

Finally, the ALJ must give advance notice to a pro se claimant of adverse findings.

*Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97

Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)).  This allows the pro se

claimant to "produce additional medical evidence or call [her] treating physician as a witness."

*Brown v. Barnhard*, 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003)

(citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

### 3.    The Commissioner's Duty to Develop the Record

The ALJ generally has an affirmative obligation to develop the administrative record.

20 C.F.R. § 404.1512(d); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security

proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts

and develop the arguments both for and against granting benefits[.]").  Under the Act, the ALJ

must "make every reasonable effort to obtain from the individual's treating physician ... all medical evidence, including diagnostic tests, necessary in order to properly make" a determination of disability. 42 U.S.C. § 423(d)(5)(B). Furthermore, when the claimant is unrepresented by counsel, the ALJ "has a duty to probe scrupulously and conscientiously into and explore all relevant facts . . . and to ensure that the record is adequate to support his decision." *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999), citing *Dechirico v. Callahan*, 134 F.3d 1177, 1183 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996). Remand to the Commissioner is appropriate when there are "obvious gaps" in the record and the ALJ has failed to seek out additional information to fill those gaps. *See Lopez v. Comm'r of Soc. Sec.*, 622 Fed. Appx. 59 (2d Cir. N.Y. 2015), citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

## C.   Issues on Appeal

### 1.   The ALJ Failed to Properly Apply the Treating Physician Rule.

Burgess argues that the ALJ failed to properly weigh the opinion of his treating psychiatrist, Dr. Sharma, when the opinion was not assigned controlling weight. (Pl. Mem. at 7-12.) Burgess also argues that the ALJ assigned too much weight to the opinions of the consultative psychiatrists, Dr. Meadow and Dr. Mahony. (*Id.*) The Court agrees and finds that remand is warranted.

#### a.   Dr. Parvesh Sharma

Burgess argues that Dr. Parvesh Sharma's opinion should have been assigned controlling weight because it is based on appropriate medical findings and is not contradicted by other substantial evidence in the record. (Pl. Mem. at 11.) A treating physician's opinion as to the nature and severity of the impairment is given controlling weight "so long as it is well-supported

26

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted); 20 C.F.R. § 404.1527(d)(2).  Burgess argues that it is harder to find objective medical evidence to support a psychiatric diagnosis.  (Pl. Mem. at 9.)  A medical opinion may be assigned more weight if it is supported by psychiatric signs, which are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g. abnormalities of behavior, mood, thought, memory, orientation, development, or perception.  *See* 20 C.F.R. §416.927(c)(3) and §416.928.  In assigning little weight to Dr. Sharma's opinion, the ALJ made no mention of the treating physician rule and did not address whether Dr. Sharma was a treating physician.

Where the treating physician's opinion is not given controlling weight, it should be weighed in accordance with the factors in 20 C.F.R. § 404.1527 and § 416.927.  (Pl. Mem. at 11.)  These factors include:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  If an ALJ gives a treating physician opinion something less than "controlling weight," she must provide good reasons for doing so. Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.  *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).  In the present case, the ALJ only cited the length of the treatment relationship at the time the opinion was produced and its consistency with records from the same day.  (Tr. at 18.)  She did not consider factors that weigh in favor of assigning greater weight to Dr. Sharma's opinion, including the continuing relationship between Burgess and Dr. Sharma, Dr. Sharma's psychiatric specialty, or other

27

evidence on the record that supported Dr. Sharma's opinion. For example, Dr. Mahony's opinion stated that Burgess's impairments "will interfere with [his] ability to function on a daily basis." (*Id.* at 474.) Most importantly, in the Court's view, the ALJ failed to address Burgess's multiple visits to the Montefiore emergency department over several years, which reflect the severity of Burgess's panic attacks. (*Id.* at 336-79, 414-30.)

Where "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983). Although the ALJ need not explicitly consider every item of evidence in the record, in the present case she failed to consider the record as a whole or discuss the regulatory factors in weighing Dr. Sharma's opinion. The ALJ erred in assigning Dr. Sharma's opinion little weight with minimal discussion. Therefore, the Court recommends that the case be remanded for a comprehensive weighing of the regulatory factors.

### b.    Consultative Physicians

The ALJ assigned "significant weight" to the opinions of Drs. Meadow and Mahony because they are "based on clinical findings" and "consistent with the medical evidence." (Tr. at 18.) Burgess argues that the consultative psychiatrists' opinions should have received less weight because they did not receive the necessary background information to evaluate Burgess's disability. (Pl. Mem. at 10.) He does not, however, identify any specific background information that might have led to a different result. (*Id.*) The reports from Dr. Meadow and Dr. Mahony show that they obtained a detailed personal history from Burgess, including information

on when he was drugged and his history of drug and alcohol use. (Tr. at 385-86, 472-73.) The Court does not find that the ALJ erred in this regard.

Burgess points out, however, that after the ALJ's opinion was issued, Dr. Meadow has been indicted for Medicaid and Medicare fraud. (Pl. Mem. at 5.) The Commissioner argues that Dr. Meadow's report was "generally consistent" with the rest of the record. (Def. Mem. at 18-19.) Dr. Meadow's report records that Burgess's demeanor was "cooperative" and his thought process was "coherent and goal directed," with "[n]o evidence of hallucinations, delusions, or paranoia." (Tr. at 386.) Burgess's affect was "[a]ppropriate in speech and thought content," and his mood was "[d]epressed" and "anxious." (*Id.*) Similarly, Dr. Mahony's report from January 14, 2014, notes that Burgess was "cooperative," his thought process was "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia," but his affect was "[d]epressed" and his mood was "[d]ysthymic." (*Id.* at 473.) Dr. Sharma's records also reflect a "logical" thought process with no hallucinations, delusions or paranoid ideation, with "constricted" affect. (*Id.* at 527-29.) Even so, the Court is aware that Dr. Meadow has since pleaded guilty to healthcare fraud. (Def. Mem. at 18-19.) This is sufficient reason for the Court to consider Dr. Meadow's opinion in a critical light.

The Commissioner argues that even if Dr. Meadow's opinion was set aside, Dr. Mahony's opinion is sufficient "substantial evidence." (Def. Mem. at 19.) Although Dr. Meadow and Dr. Mahony's opinions are similar, Dr. Mahony's opinion reflects more severe limitations. In particular, Dr. Meadow found that the examination results "appear to be consistent with psychiatric problems, but in itself, this does not appear to be significant enough to interfere with [Burgess's] ability to function on a daily basis." (Tr. at 387.) In contrast, Dr. Mahony found that the results "will interfere with [Burgess's] ability to function on a daily

basis." (*Id.* at 474.)  While Dr. Meadow opined that Burgess "would have some difficulty dealing with stress," Dr. Mahony opined that Burgess faced mild difficulties in "maintaining attention and concentration and maintaining a regular schedule," and moderate limitations in "learning new tasks, performing complex tasks, making appropriate decisions, relating to others, and dealing with stress."  (*Id.* at 387, 474.)  Given that both opinions received significant weight, it is likely that Dr. Meadow's opinion influenced the ALJ's decision.

The Commissioner's argument that relying on Dr. Meadow's opinion was harmless error is also unpersuasive because it is not the role of the Court to overlook a legal error save for very limited circumstances.  *See Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) (discussing *Zabala v. Astrue*, 595 F.3d 402 (2d Cir. 2010)) (affirming that a legal error was not prejudicial because "the excluded evidence is essentially duplicative of evidence considered by the ALJ"). In the present case, the ALJ explicitly assigned "significant weight" to Dr. Meadow's opinion when it reflected milder limitations than other psychiatrists' reports, and it is likely that it influenced the ALJ's analysis.  The Court concludes that the risk of legal error is too high and the case should be remanded.

Setting aside the issue of Dr. Meadow's opinion, the ALJ's decision to assign significant weight to the consultative physicians is also contrary to the treating physician rule.  The Second Circuit has cautioned ALJs not to rely heavily on the findings of consultative physicians after a single examination.  *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013).  "Consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.  Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (citing *Torres v. Bowen*, 700 F. Supp. 1306, 1312

(S.D.N.Y. 1988)). This is especially important for a psychiatric diagnosis. Dr. Sharma's report reflects that Burgess has good days and bad days. (Tr. at 461.) Dr. Sharma treated Burgess for over a year and there are no indications that he amended his opinion, while Dr. Meadow and Dr. Mahony only saw Burgess on a single day each and over two years apart. The Court rejects the Commissioner's assertion that two evaluations by different consultative psychiatrists "provided a more longitudinal picture" of Burgess's condition than an evaluation by his treating psychiatrist. (Def. Mem. at 17.) The treating physician rule also holds that the opinion of a treating physician on the subject of medical disability is "entitled to some extra weight, even if contradicted by substantial evidence, because the treating source is inherently more familiar with a claimant's medical condition than are other sources." *Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir. 2000). Therefore, the Court remands the case for proper weighing of the opinions of treating and consulting psychiatrists.

### 2. The ALJ failed to properly evaluate Burgess's credibility.

Burgess argues that the ALJ's decision on his credibility was not supported by substantial evidence.[2] Given that the Court has decided that there was legal error, the Court does not rule on this issue, but discusses the applicable standard below.

ALJ Barr determined that Burgess's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.* at 15.) Specifically, the ALJ notes Burgess's treatment regime, his activities of daily living, his attendance at work and school, and his mental status examinations. (*Id.* at 18.)

---

[2] SSR 96-7p was rescinded and replaced by SSR 16-3p from March 24, 2016 onwards. The SSA has eliminated the use of the term "credibility" in the two-step analysis to clarify that subjective symptom evaluation is not an examination of an individual's character. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).

The substantial evidence review standard is "a very deferential standard of review – even more so than the "clearly erroneous" standard." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012). "[T]he court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Secretary of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)). "If there is substantial evidence to support the determination, it must be upheld." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). Substantial evidence, however, requires "more than a mere scintilla." *Selian*, 708 F.3d at 417 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In making the credibility finding, the ALJ discussed factors set forth in 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3), namely Burgess's daily activities and treatment regime. By citing to specific parts of the record and demonstrating their inconsistencies, the ALJ has satisfied the requirement that she must discuss "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

Burgess takes specific issue with the ALJ's discussion of his non-compliance with medical treatment. (Pl. Mem. at 14.) The Commissioner "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p, 2016 WL 1020935 (March 16, 2016). "A claimant's denial of psychiatric disability or the refusal to obtain treatment for it is not necessarily probative." *De*

*Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 934 (2d Cir. 1984).  The Commissioner argues that Burgess did not show that his noncompliance with medication was based on his psychological disorder, and Burgess's mental status examinations show that his judgment was good or fair.  (Def. Mem. at 21-22.)  The Court agrees with the Commissioner.  The record also shows that Burgess failed to attend some appointments because he was not having panic attacks, not because of his psychological disorder.  (Tr. at 529.)

Burgess also argues that the ALJ's discussion of Burgess's work experience and activities of daily living is wrong and does not demonstrate that Burgess can handle "the mental demands of full-time competitive work."  (Pl. Mem. at 14-15.)  The Commissioner cites to cases that demonstrate how activities of daily living may be relevant in the ALJ's decision.  (Def. Mem. at 23.)  Given that the substantial evidence review standard is a deferential one, and the ALJ has cited to specific activities to substantiate its finding, the Court agrees with the ALJ.

Burgess's final contention is about the mental status examinations on the record.  (Pl. Mem. at 13-14.) This argument is related to the weight assigned to the opinions of treating and consultative physicians.  Because the Court has decided that the ALJ erred in this regard, it cannot discuss whether the decision was issued based on substantial evidence.  Therefore, the Court remands the case for application of the correct legal principles.

**D.    Remedy**

Under 42 U.S.C. § 405(g), the District Court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for further proceedings.  Where an ALJ has committed a legal error that may have affected the disposition of the case, such failure constitutes reversible error.  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004). Remand may be appropriate if "the ALJ has applied an improper legal standard."  *Rosa v. Callahan*, 168 F.3d

72, 82-83 (2d Cir. 1999). Because ALJ Barr failed to apply the correct legal standard for weighing the opinions of Burgess's treating and consultative physicians, remand is appropriate. Burgess did not argue that the ALJ's residual functional capacity finding was not supported by substantial evidence so the Court does not decide this issue. On remand, the Commissioner shall assign proper weight to the opinions of Burgess's treating physicians and consultative physicians.

## IV. CONCLUSION

For the foregoing reasons, Burgess's motion is **GRANTED**, the Commissioner's motion is **DENIED**, and the case is **REMANDED** pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion and Order.

Having resolved Doc. Nos. 14 and 16, the Clerk of Court is directed to terminate this action.

**SO ORDERED this 19th day of December 2016.**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**